**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DART INDUSTRIES, INC.,**
          **Plaintiff,**

**-vs-**                                        **Case No. 6:06-cv-1864-Orl-28DAB**

**DAVID ACOR,**
**UNITED INVENTORY SERVICE, INC.,**
**d/b/a UIS Polymers,**
          **Defendants.**
_____/

## ORDER

This cause is before the Court on Plaintiff's Motion to Partially Strike the Testimony and Expert Report of Freeman E. Reisner (Doc. 85). Defendants, David Acor ("Acor") and United Inventory Service, Inc. ("UIS") (collectively "Defendants"), have offered the expert report of Mr. Reisner with regard to the cause of the fire that is the subject of this lawsuit. Plaintiff, Dart Industries, Inc., now asks the Court "to strike, in part, the testimony and expert report" of Mr. Reisner "in respect to the theory of [c]arbon [b]lack dust contamination." (Doc. 85 at 10). As set forth below, Plaintiff's motion is granted.

### I. Factual History

This case involves claims for property damage resulting from a fire in Halls, Tennessee that destroyed a building owned by Plaintiff.[1] Pursuant to an oral lease, Defendants leased the building from Plaintiff for the purpose of storing UIS's overflow of

---

[1] Plaintiff operates as a subsidiary of Tupperware Brands Corporation.

plastic. On November 4, 2006, a fire broke out which resulted in the total destruction of the building. The next day, Defendants retained Haag Engineering, by whom Mr. Reisner is employed, to determine the cause and origin of the fire. (Reisner Dep. at 12-13).

As part of his investigation, Mr. Reisner made three visits to the building site. The first site visit occurred on November 6, 2006, while the fire was still burning. Due to the ongoing fire, Mr. Reisner was able to inspect only the transformer installation on the west side of the building. (Id. at 16). Mr. Reisner observed that the transformers showed no external signs of damage and that two high-voltage fuses had failed. (Id. at 17). Also during this first site visit, Mr. Reisner's colleague, Stoney Kirkpatrick,[2] interviewed various people at the UIS building. (Id. at 18). Mr. Kirkpatrick learned from his interviews that carbon black was present in the plant due to the operations of a prior tenant, a roofing manufacturer who used carbon black–-"an ingredient that inhibits degradation of roofing materials by ultraviolet solar radiation"—in its manufacturing process. (Id. at 36; Reisner Report, Ex. A-1-A to Doc. 85, at 2).

Mr. Reisner returned alone for a second site visit on November 11, 2006 to inspect the scene after the fire had been extinguished. (Reisner Dep. at 21-22). During this visit, Mr. Reisner inspected various pieces of electrical equipment (id. at 22-24) and found evidence of a severe electrical breakdown between the aluminum bus conductors, specifically noting a large hole melted in the bus duct cover due to arcing that occurred

---

[2]An ambiguity exists in the record as to whether the colleague's name is Stoney *Kirk*patrick or Stoney *Fitz*patrick. In his deposition, Mr. Reisner stated the name as Stoney Kirkpatrick (Reisner Dep. at 12), but in its motion Plaintiff refers to Stoney Fitzpatrick (Doc. 85 at 5). The Court will refer to him as Mr. Kirkpatrick throughout this Order.

during the electrical breakdown as well as melted aluminum bus bars inside the bus duct itself.  (Reisner Report at 3).  Mr. Reisner made his third and final visit to the site on February 26, 2008, during which he interviewed Justin Reed—an eyewitness to the fire—and others who worked in the area where the fire presumably started.  (Reisner Dep. at 27-28).  Mr. Reisner stated that Reed reported seeing "sparks falling from the bus duct area on the west side of the building."  (Id. at 29).

Based upon his three site visits, conversations with witnesses, and the notes of Mr. Kirkpatrick, Mr. Reisner prepared his report on the cause and origin of the fire.  The report states in part:

> Previous occupants of the storage building had used carbon black in the manufacture of roll roofing.  Reportedly, there was carbon black dust distributed throughout the storage warehouse.  Dust or carbon black apparently contaminated the bus duct and became a path of low resistance between the bus duct conductors.  Carbon black has a resistivity of 1375 microhm-cm compared to copper at 1.673 microhm-cm.  Over time, voltage could have tracked through the contaminate and eventually caused shorting between the bus duct conductors.

(Reisner Rep. at 4).  Mr. Reisner concludes in his report that "[t]here was contamination—probably carbon black dust—of the electrical bus duct . . . [which] caused an electrical breakdown in the electrical bus duct inside the storage building."  (Id.).  "Sparks from the electrical breakdown in the bus duct caused ignition of combustible materials in the storage building, and the fire ensued."  (Id.).  Plaintiff now challenges the reliability of Mr. Reisner's theory that carbon black dust contamination led to the fire.

-3-

## II. Standards of Admissibility

The Federal Rules of Evidence govern the admissibility of expert opinion testimony. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). In applying these rules, the trial court serves a "gatekeeping" function to screen expert testimony in order to ensure its relevance and reliability before its presentation to the jury. Id. at 589 & n.7. Rule 702, which was amended in response to Daubert, provides in part that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The primary focus of Daubert was on the methodology applied by the expert in arriving at an opinion. The second requirement of Rule 702 now addresses this concern. The Daubert Court provided a nonexclusive list of factors to be considered in making assessments of proffered scientific testimony and in determining whether the opinion is "ground[ed] in the methods and procedures of science." Daubert, 509 U.S. at 590. The list includes the following considerations: the testability of theory; publication and peer review; assessment of the known or potential error rate; and general acceptance of the theory in the relevant scientific community. Id. at 593-94. This list, however, is not intended to be a "definitive checklist" and should not impinge on flexible inquiry by the trial judge in evaluating the reliability of expert testimony. Id. at 593. "Consistent with this understanding, the advisory committee notes for Rule 702 explain that the 2000 amendment, while intended as an endorsement of the Daubert conception of the trial judge as a gatekeeper, was not

intended to 'codify' the specific factors mentioned in Daubert." Rudd v. Gen. Motors Corp., 127 F. Supp. 2d 1330, 1335 (M.D. Ala. 2001).

If there were any remaining doubts to the contrary, the U.S. Supreme Court made clear in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), that the trial court's "gatekeeping" responsibilities apply not only to testimony based on scientific knowledge but also to testimony based on technical or specialized knowledge, including engineering. Experts "relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000). Flexibility is essential in assessing the reliability of such expert testimony. In keeping with a tailored and flexible approach in assessing the testimony, the Daubert factors, as well as others, may be considered. Kumho, 526 U.S. at 150. Similarly, not all Daubert factors will necessarily be applicable in every case. Id. at 151. Ultimately, the factors to be considered in assessing reliability will depend on "the particular circumstances of the particular case at issue." Id. at 150. Whatever factors are considered, it is the court's responsibility "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

In carrying out their "gatekeeping" obligation, trial courts should keep in mind three important principles. First, the "gatekeeping" function is intended to counterbalance the latitude of Rule 702's allowing an expert to express an opinion, which is, after all, "a relaxation of the usual requirement of firsthand knowledge" of the facts about which a

witness testifies. Rudd, 127 F. Supp. 2d at 1335. Judicial screening of expert testimony for relevance and reliability is not intended to usurp the role of the jury as finder of fact. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311 (11th Cir. 1999). Indeed, conscientious application of this rule should result in the exclusion of expert testimony being "the exception rather than the rule." See Fed. R. Evid. 702 advisory committee's note (2000). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. Second, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Finally, it is the proponent of expert opinion testimony who bears the burden of establishing its admissibility by a preponderance of the evidence. See Borjaily v. United States, 483 U.S. 171, 175-76 (1987), *cited in* Daubert, 509 U.S. at 592 n.10. This does not mean, however, that the proponent must prove the expert testimony is scientifically correct; he need only show that it is reliable. See Fed. R. Evid. 702 advisory committee's note (2000).

### III.  Analysis

The first step in assessing the admissibility of expert testimony under Federal Rule of Evidence 702 requires the Court to determine whether a witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Mr. Reisner is a consulting engineer for Haag Engineering Company with a concentration on electrical

failures and fire cause and origin, and he maintains a license as a professional engineer in the State of Texas. (Reisner Dep. at 8-9). He received a bachelor's degree in mathematics and physics from Angelo State University in 1970 and pursued part-time, but did not complete, a degree in electrical engineering from the University of Texas at Arlington. (Id. at 9). Mr. Reisner is a member of the International Association of Arson Investigators, the National Association of Fire Investigators, the Texas Society of Professional Engineers, and the National Society of Professional Engineers. (Id. at 10). The State of Texas granted Mr. Reisner the designation of professional engineer based upon work experience. (Id. at 12). Based on Mr. Reisner's training and experience, the Court finds that Mr. Reisner qualifies as an expert regarding fire cause and origin.

Once a proponent of expert testimony clears this initial hurdle of Rule 702, the proponent must still satisfy the rule's other three requirements. The first of these is that the proponent show that the testimony to be presented is based upon sufficient facts or data. Plaintiff contends that Mr. Reisner's assertion that carbon black was left behind by the roofing business is speculative and that Mr. Reisner's conclusion that carbon black contaminated the bus ducts and created sparks is not supported by any evidence. The Court disagrees–-at least with regard to Mr. Reisner's deposition testimony–on the first point but agrees on the second.

At the time Mr. Reisner prepared his expert report, his basis for concluding that carbon black dust was present in the plant was indeed a bit speculative. The only evidence that Mr. Reisner had at that time on this topic was Mr. Kirkpatrick's notes and Mr. Reisner's conversation with Mr. Kirkpatrick regarding the prior tenant's use of carbon black in its

manufacturing process.  (Reisner Dep. at 18, 35-37, 53).  Mr. Reisner stated in his deposition that the prior tenant's use of carbon black was significant in his determination that carbon black was present in the building at the time of the fire because "you can conclude that . . . carbon black was used in the building and *probably was deposited throughout the building*" due to carbon black being a very fine dust that would easily settle on exposed structures in the warehouse.  (Id. at 53) (emphasis added).

Despite the significance to Mr. Reisner of carbon black's historical use in the building, when he compiled his report he failed to question several basic facts regarding carbon black's presence in the building at the time of the fire.  Mr. Reisner never questioned how long the prior tenant had been absent from the building; where, if at all, the carbon black was located within the building at the time of the fire; or the extent of the cleanup process, if any, undertaken after the prior tenant had exited the building.  (Id. at 36-37).  He failed to conduct even a cursory investigation regarding carbon black's presence in the building prior to reaching his opinion.  Instead, he merely assumed as fact in his report that carbon black was present without any factual underpinnings other than Mr. Kirkpatrick's notes regarding the use of carbon black in the facility at some time prior to the fire.

By the time Mr. Reisner's deposition was taken in May 2008, however, Mr. Reisner had obtained additional, reliable information regarding the presence of carbon black at the facility.  In addition to the information learned from Mr. Kirkpatrick, Mr. Reisner had reviewed the depositions of Kenneth Bridges and Billy Joe Childress, which were taken in April 2008.  From these depositions, Mr. Reisner learned of carbon black's past presence in the building, an approximation of its prior dispersion, and what remedial measures were taken to remove

-8-

it.  (Id. at 54-55).

Mr. Bridges had worked for Tupperware from 1968 to 1999 in various positions, including plant maintenance foreman, supervisor, and manager.  He testified that "a tremendous amount of carbon black [was present] in [the] building when [the roofing manufacturer] was doing [its] process," and that the carbon black "settled on most everything in th[e] building[]."  (Bridges Dep. at 108).  After the roofing material business left the property, Tupperware retained a company called SIMMCO to clean the carbon black out of the building; Mr. Childress, who had taken over the property's management after Mr. Bridges left in 1999, oversaw that cleanup on Tupperware's behalf.  Mr. Childress testified in his deposition that SIMMCO performed a power washing to reduce the carbon black and that they in fact "went over it a couple times" with a power washer.  (Childress Dep. at 73-74).

In addition to these depositions, Mr. Reisner also reviewed a letter from Maureen Morrissey on behalf of Tupperware to David Blurton of SIMMCO.  (Reisner Dep. at 55).  In that letter, dated January 31, 2003, Ms. Morrissey noted that "Tupperware did not require a full clean-up of the walls and beams, but only a single power washing to reduce the carbon black dust."  (Morrissey Letter, Ex. A-4 to Doc. 85, at 1).  Based upon this additional information—the depositions of Bridges and Childress and the Morrissey letter—Mr. Reisner testified in his deposition that within a reasonably degree of engineering probability, carbon black was present at the time of the fire.  (Reisner Dep. at 56-57).  In light of the additional, more reliable information that Mr. Reisner had regarding carbon black at the time of his

deposition, the Court does not find this conclusion speculative.[3]

However, Mr. Reisner's opinion that carbon dust contamination caused the fire does not survive the Court's "gatekeeping" analysis. As earlier noted, after relating that prior building tenants used carbon black, Mr. Reisner states in his report that "Dust or carbon black apparently contaminated the bus duct and became a path of low resistance between the bus duct conductors. . . . Over time, voltage could have tracked through the contamina[nt] and eventually caused shorting between the bus duct conductors." (Reisner Report at 4). Mr. Reisner then states in his conclusion section that "[t]here was contamination—probably carbon black dust—of the electrical bus duct inside the storage building," and that "[t]he contamination caused an electrical breakdown in the electrical bus duct." (Id.).

Although Defendants assert that Mr. Reisner's conclusion that carbon black caused the electric breakdown is based upon "factual testimony from several witnesses" as well as on his on-site investigation and his fire investigation experience, the Court finds Mr. Reisner's conclusion that carbon black was the source of contamination of the electrical bus duct to be speculative and not based upon sufficient facts or data. Mr. Reisner failed to take any samples or perform any analysis on any of the equipment to determine if carbon black

---

[3]The Court recognizes that the fact that Mr. Reisner did not obtain reliable information regarding the presence of carbon black in the building as of the time of the fire until after his report was prepared is problematic. However, in light of the Court's ultimate conclusion that the opinion as to causation is not supported by reliable evidence in any event, the Court need not address whether the timing problem could be solved by the filing of a supplemental report or whether such supplementation would be appropriate here.

-10-

was the source of contamination of the bus duct.[4] (Reisner Dep. at 41). When questioned at his deposition about the basis for his statement that dust or carbon black contaminated the bus duct, Mr. Reisner responded, "[t]he bus duct failed and typically [a] bus duct doesn't fail unless it's contaminated by some medium that allows current flow and leads to the breakdown." (Id. at 48). Mr. Reisner appears to conclude that since carbon black was present in the building and the bus duct failed, carbon black must have been the source of contamination that caused the bus duct to fail. This is exactly the type of *ipse dixit* that is not allowed in district courts. See Joiner, 522 U.S. at 146. It would be an impermissible leap to allow Mr. Reisner to state that carbon black caused the bus duct to fail without some additional facts. The Court finds that it would be an improper use of expert testimony for Mr. Reisner to state that carbon black caused the electrical failure. Thus, the Court will grant Plaintiff's motion exclude Mr. Reisner's opinion that carbon black contamination caused the electrical failure that led to the fire in this case.[5]

---

[4]Despite Defendants' reliance on Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., No. 3:02-CV-491, 2006 WL 1788967 (E.D. Tenn. June 27, 2006), the Court finds the lack of any sampling or tests conducted on the bus duct troubling. In Travelers Indemnity, the court held that the expert possessed sufficient facts or data to present expert testimony that diffusion fluid spread through the HVAC system's duct system and aided in the spread of a building fire despite the lack of testing by the expert to confirm the presence of the diffusion fluid. Id. at *3-4. In that case, the court relied heavily on eyewitness testimony that the diffusion fluid was present in the HVAC system. Id. at *4-5. In the case at bar, no eyewitness has stated that he actually saw carbon black in the bus duct, and therefore the Travelers Indemnity case is distinguishable.

[5]This ruling, of course, does not preclude Defendants from calling Mr. Reisner as an expert at trial. Mr. Reisner may testify as to other matters, including that the fire was caused by some form of contamination of the bus duct. He may not, however, opine that carbon black contamination caused the fire.

IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** that Plaintiff's Motion to Partially Strike the Testimony and Expert Report of Freeman E. Reisner (Doc. 85) is **GRANTED** as set forth herein.

**DONE** and **ORDERED** in Orlando, Florida this 9th day of October, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record