# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DART INDUSTRIES, INC.,**
                      **Plaintiff,**

**-vs-**                                    **Case No.  6:06-cv-1864-Orl-28DAB**

**DAVID ACOR and**
**UNITED INVENTORY SERVICE, INC.,**
**d/b/a UIS Polymers,**
                      **Defendants.**
_____/

# ORDER

On November 4, 2006, a fire broke out in a 490,000-square-foot industrial building in Halls, Tennessee.  The fire burned for several days and destroyed much of the building and most of its contents.  At the time of the fire, the building was owned by Plaintiff Dart Industries, Inc. ("Dart"), and the contents of the building were owned by, or on consignment to, Defendant United Inventory Service, Inc. ("UIS").[1]  Dart had earlier given Defendant David Acor, UIS's president, permission for UIS to use the building for storage, though the extent of that permission is somewhat in dispute.

One month after the fire, Dart brought the instant action against both Mr. Acor and UIS (collectively "Defendants") seeking to recover damages, and Defendants brought counterclaims against Dart.[2]  The matter is now before the Court on the parties' competing

_____

[1]UIS also does business as UIS Polymers.

[2]The two counterclaims were initially brought jointly by both Mr. Acor and UIS (see Doc. 34), but Mr. Acor has dismissed his counterclaims with prejudice.  Thus, the only remaining counterclaimant is UIS.

motions for summary judgment.[3]  The Court heard oral argument on these motions on

September 4, 2008 (see Mins., Doc. 103) and announced rulings on some of the issues in

open court on October 30, 2008, informing the parties that Dart's Motion for Summary

Judgment must be denied and that Defendants' Motion for Summary Judgment must be

granted in part and denied in part.  In this Order, the Court makes additional rulings and

explains the rulings previously announced.

## I.  Background

Dart is a wholly-owned subsidiary of Tupperware Brands Corporation ("Tupperware")[4]

with its principal place of business in Orlando, Florida.  Dart owns a parcel of property in

Halls, Tennessee ("the Campus"), on which sit several commercial buildings.  Throughout

the 1970s and continuing into the early 1990s, Tupperware manufactured its products at one

of these buildings, referred to as "the Plant," a 490,000-square-foot steel and concrete

building.

In 1994, due to a downturn in business, Tupperware ceased its manufacturing

operations at the Plant, and the building was then used for storage and as a distribution

center.  In 1999, Dart sold the Plant and the rest of the Campus to Drake Roofing ("Drake"),

---

[3]The pertinent filings are:  Plaintiff's Motion for Partial Summary Judgment (Doc. 84), Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 92), Plaintiff's Reply in Support of Motion for Partial Summary Judgment (Doc. 97), Defendants' Motion for Final Summary Judgment (Doc. 86), and Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Doc. 90).

[4]Throughout the case, the parties have referred to Dart and Tupperware interchangeably, and in this Order the Court at times does so as well.

taking back a purchase-money mortgage.  Defendant UIS then bought an 80,000-square-foot building ("the UIS Building")[5] on the west side of the Plant from Drake.  (Acor Dep.[6] at 17-18).  Mr. Acor had started UIS in 1991 as a pharmaceutical inventory business, but it soon became involved in the recycling business and by 2000 was recycling plastics itself. (Id. at 12-16).

In 2002, Dart foreclosed on the mortgage it held on Drake's remaining portion of the Campus, including the Plant.  The property had been abandoned by Drake, and Dart secured it and hired a contractor, SIMMCO, to clean up the building.  In May 2003, Dart entered into a Lease Agreement with PolyOne Corporation allowing PolyOne to use 50,000 square feet of the Plant to temporarily store polycarbonate resins, polycarbonate, filler materials, and packaging materials on a month-to-month basis.  (Lease Agreement, Attach. to Doc. 92; see also Morrissey Dep. at 50-51; Benkovich Dep. at 36).

By early 2004, however, the Plant was again vacant.  Noticing the vacancy, Mr. Acor called Carl Benkovich, Tupperware's CFO and Vice President, in Orlando in 2004 and asked him if UIS could use the Plant to store some material.  (Acor Dep. at 34).  Mr. Benkovich told him that UIS could use the space, and UIS was not expected to pay rent at that time.  (Id. at 35).  There is no written agreement between Dart and UIS regarding use of the Plant, but based on Mr. Benkovich's oral grant of permission, UIS began moving materials into the

[5]This building is also known as "the Tupper Express Building" but will be referred to herein as the UIS Building.

[6]The deposition of David Acor's wife, Marcie, is also in the record.  Unless otherwise noted, references to "Acor Dep." refer to the deposition of David Acor rather than Marcie Acor.

Plant during the first quarter of 2004.  (Id. at 36).

In the third quarter of 2005, Mr. Acor contacted Maureen Morrissey, a Dart Vice President, in Orlando to ask her if UIS could store quite a bit of excess material in the Plant. (Id. at 37).  Mr. Acor felt the need to ask because of an increase in the volume of material that was coming in; it was, according to Mr. Acor, a "significant" volume.  (Id.).  Ms. Morrissey told him that UIS could use the space but would have to pay for the excess utilities.  (Id. at 40).  Mr. Acor does not recall explaining to Ms. Morrissey the exact amount of material in the third quarter of 2005, but he claims that he told her that the volume was large.  (Id. at 39).  Prior to the third quarter of 2005, UIS had been storing between five and twenty tractor-trailer loads of material in the Plant, with each load averaging between 30,000 and 40,000 pounds.  (Id. at 37-38).  In the third quarter of 2005, the amount was increasing to between 125 and 250 truckloads.  (Id. at 39).

By early November 2006, UIS had 350 to 450 tractor-trailer loads of materials stored in the Plant.  (Id. at 46).  These materials included plastic for grinding, chips resulting from the grinding, finished goods, bundled plastic, and equipment.  (Id. at 47).  There is also evidence that UIS had begun using machines for baling cardboard and for rewinding tape in the Plant by the fall of 2006.  (Aff. of Jeremy Hampton, Ex. D to Doc. 84, ¶ 5; Dep. of Randall Glenn at 24-26, 116-17).

In the late afternoon or early evening of Saturday, November 4, 2006, a fire broke out at the Plant.  The parties have stipulated that "[t]he spark which started the Plant Fire was a result of the malfunction of an electric bus bar in the southwest quadrant of the Plant." (Stipulated Fact 8, Joint Pretrial Statement, Doc. 108, at 59).  According to a UIS employee

who was working in the Plant when the fire broke out, just before the fire the lights went out briefly and sparks then fell from the ceiling where the electric bus bars were located.  (Reed Dep. at 16-19).  "The sparks ignited the materials that Defendants had placed in the Plant." (Stipulated Fact 9, Joint Pretrial Statement at 59).  As noted earlier, the fire burned for several days and destroyed much of the Plant and its contents.

Although the parties have agreed that the electrical bus bar was the source of the fire, each side has pointed the finger at the other for their respective actions leading up to the fire as contributing to the bus bar malfunction or the extent of the damage to the parties' property, or both.  Dart blames UIS for storing an excessive amount of combustible material in the building—beyond the amount for which Dart allegedly had given UIS permission—thereby fueling the fire, and Dart also contends that UIS's use of heavy equipment in the Plant without Dart's knowledge caused or contributed to the start of the fire. UIS, meanwhile, contends that Dart failed to maintain the electrical system properly, leading to the malfunction of the bus bar.  Additionally, each side faults the other for not having the building's fire suppression system in working order so that the blaze could have been contained before it got out of control.

Dart has brought nine claims against Defendants:  breach of contract (Count I), fraudulent misrepresentation (Count II), negligent misrepresentation (Count III), breach of implied covenant of good faith and fair dealing (Count IV), unjust enrichment (Count V), waste (Count VI), trespass (Count VII), violation of the Florida Deceptive and Unfair Trade Practices Act (Count VIII); and for declaratory and injunctive relief (Count IX).  (See Doc. 1). In its Counterclaim, UIS sets forth claims of negligence (Count I) and conversion (Count II),

which relate, respectively, to the contents of the building at the time of and after the fire. (See Doc. 34).  Dart has moved for summary judgment on its claim of waste (Count VI of the Complaint) and on UIS's counterclaim for negligence (Count I of the Counterclaim). Defendants have moved for summary judgment on all of Dart's claims.

## II.  Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issues of material fact remain.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Cross motions for summary judgment do not change the standard."  Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007).  "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'"  Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979)).  "Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts."  Id.; accord Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999) ("When considering motions from both parties for summary judgment, the court applies the same standard of review and so may not resolve genuine issues of material fact.  Instead, [the court must] consider and rule upon each

party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." (citations omitted)).

### III.  The Merits of the Parties' Motions

### A.  Plaintiff's Motion for Partial Summary Judgment (Doc. 84)

Dart's summary judgment motion addresses only two of the many claims at issue in this case:  Dart's claim for waste (Count VI) and Defendants' counterclaim for negligence. The parties agree that Tennessee law governs these two claims.  (See Joint Pretrial Statement, Doc. 108, at 59).

### 1.  *Dart's Claim for Waste (Count VI of the Complaint)*

In Count VI of its Complaint, Dart brings a claim of waste under Tennessee law.  Dart seeks summary judgment on this claim, arguing that Defendants committed waste when they "recklessly overloaded the Plant with combustible plastics, cardboard[,] and paper[,] all while being fully aware that the Plant had no active fire suppression system or while recklessly turning a blind eye, for years, to the status of the fire suppression system." (Doc. 84 at 15). Dart argues that "but for Defendants' unreasonable and reckless actions, the Plant Fire would have caused little or no damage to the Plant because, simply put, Dart was merely storing air in a noncombustible structure that was being marketed for lease or sale." (Id.).

Waste is a common law doctrine that does not appear often in modern case law.  As one property law scholar explains:  "[T]he common law imposed few duties on the tenant. The principal legal obligation of the tenant . . . was to abstain from the commission of 'waste.'

The somewhat nebulous concept of waste required the tenant to refrain from conduct in the use and enjoyment of the premises that was injurious to the reversionary interest of the landlord." Cornelius J. Moynihan, Introduction to the Law of Real Property 83 (2d ed. 1988). "Waste can be either voluntary or permissive. Voluntary waste consists of affirmative action by the tenant resulting in action to the property, or an impermissible substantial alteration of the property; permissive waste consists of neglect by the tenant of a duty imposed by law with respect to the property, such as a duty to make minor repairs." Id.; accord 93 C.J.S. Waste § 1 ("[W]aste involves negligence or intentional conduct which results in material damage to the property."). "The distinguishing element of voluntary waste is the positive, affirmative nature of the tortious act," while "[t]he essence of liability for permissive waste is negligence." 93 C.J.S. Waste § 4.

"The term 'waste' is not arbitrary, to be applied inflexibly, without regard to the quality of the estate, the nature or species of the property, or the relation to it of the person charged to have committed the wrong. The question as to whether waste has been committed in a given case is to be determined in view of the situation of the property, the particular facts and circumstances appearing in that case, and the conditions which exist at the time the act is committed." Id. § 16 (footnotes omitted). "Ordinarily, what constitutes waste is a question of law for the court. However, whether or not waste has been committed is a question of fact to be determined by the jury under proper instructions from the court." Id. § 37 (footnotes omitted).

Tennessee courts have had little occasion to address the doctrine, but some principles have been enunciated. In Chapman Drug Co. v. Chapman, 341 S.W.2d 392

(Tenn. 1960), cited by Dart, the court noted that "[w]aste is variously defined" and applied the "definition . . . that '[waste is] an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession, which results in its substantial injury.'" Id. at 396.  And, "'[o]nly that which does lasting damage to the remainder, or depreciates its value, is waste.'" Barber v. Westmoreland, 601 S.W.2d 712, 716 (Tenn. Ct. App. 1980) (quoting Thompson v. Thompson, 332 S.W.2d 221, 227 (1959)). Another court has noted that "[a]ctions by the current holder which may constitute waste include changes to the property, changes in use of the land, and changes in the character of the land, but only where the owners of subsequent interests have reasonable grounds for objection to the changes, where the change results in permanent injury to the inheritance, or is contrary to good husbandry." Hood v. Freemon, No. M2004-01889-COA-R3-CV, 2007 WL 27121, at *4 (Tenn. Ct. App. Jan. 3, 2007).

Again, Dart argues that Defendants committed waste by overloading the Plant with combustible material while being fully aware of, or recklessly ignoring, the fact that the Plant had no active fire suppression system.  (Doc. 84 at 15).  Regardless of the exact parameters of the doctrine of waste in present-day Tennessee, this contention by Dart is, at a minimum, laden with contested factual issues that cannot be resolved in Dart's favor on summary judgment.  As will be discussed in more detail later in this Order, Dart was on notice that UIS was storing a large volume of materials in the Plant, and UIS disputes being aware of the status of the fire suppression system.[7]  Dart is not entitled to summary judgment on this

---

[7]Dart argues in its motion that Defendants had the obligation to maintain or repair the fire suppression system, relying on the National Fire Protection Association ("NFPA") Fire

claim.[8]

————————————————

Code, which Tennessee had adopted as law.   Dart contends that under NFPA 1, "Defendants had an obligation, upon changing the use of the Plant from vacant to heavy industrial storage of combustible plastics and processing activities, to obtain the appropriate permits and to bring the Plant's fire suppression system up to the requirements of the new use, including the installation of a working sprinkler system in accordance with NFPA 13." (Doc. 84 at 16).   Arguing that "[t]he Code could not be more clear," Dart quotes NFPA section 4.5.7.1 as stating:  "In any building or structure, whether or not a physical alteration is required, a change from one occupancy classification to another shall be permitted only where such a structure, building, or portion thereof conforms with the requirements of this Code that apply to new construction for the proposed use."  (Id.).   Dart then contends that Defendants violated this provision by not disclosing their change in use and by not "bring[ing] the fire suppression system on line."  (Id. at 17).   Dart contends that violation of this statute is negligence per se and establishes lack of reasonable care by Defendants.  (Id.).

      In their opposition memorandum, Defendants assert that Dart has misrepresented the state of Tennessee law in attempting to shift the burden to Defendants to maintain the fire suppression system.   Defendants cite section 4.1.2 of NFPA 25, which provides that "[t]he responsibility for properly maintaining a water-based fire protection system shall be that of the *owner* of the property."  (Emphasis added).   They also cite section 4.1.2.4 of NFPA 25, which provides that "[w]here the owner is not the occupant, the owner shall be permitted to pass on the authority for inspecting, testing, and maintaining the fire protection systems to the occupant, management firm, or managing individual through specific provisions in the lease, written use agreement, or management contract."   Defendants thus argue that Dart was responsible for maintaining the fire suppression system and that because there is no written lease, obviously there is silence regarding the responsibility for the fire system here. In its reply memorandum, Dart maintains its position that the NFPA provisions adopted in Tennessee put the burden on UIS to protect against the hazard UIS created, again citing NFPA 1 § 4.5.7.1.  (Doc. 97 at 6-7).

      Based on the provisions the parties have presented, the Court cannot conclude as a matter of law that Defendants had the obligation to maintain or repair the system.   The Court does not read NFPA 1 § 4.5.7.1 as requiring a tenant to maintain a fire suppression system; the section does not appear to bear on landlord-tenant relations at all or to shift the obligation from the landlord to the tenant.

      [8]Dart also contends that "in the absence of any proof from the tenant/defendants as to the cause and origin of the fire, the Court must resolve the issue of liability against the tenant/defendants and in favor of the landlord/plaintiff."  (Doc. 84 at 15 (citing Olswanger v. Funk, 470 S.W.2d 13 (Tenn. Ct. App. 1970))).   In Olswanger, a written lease obligated the tenants to be liable for all damage to the premises except for ordinary wear and tear.   470 S.W.2d at 14.   A fire occurred in the leased apartment shortly after the tenants had gone out, and it was determined that the fire originated on the couch; the tenants admitted being

2.  *UIS's Claim for Negligence (Count I of the Counterclaim)*

"To prevail on a negligence claim [under Tennessee law], a plaintiff must establish the following elements:  '(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause.'" Lett v. Collis Foods, Inc., 60 S.W.3d 95, 99 (Tenn. Ct. App. 2001) (quoting McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995)). Dart contends that it is entitled to summary judgment on this claim because UIS cannot establish that Dart breached a legal duty or that Dart cause UIS's damages.

UIS asserts in its negligence counterclaim that Dart, as the owner and lessor of the Plant, owed a duty to UIS to maintain the premises in a reasonably safe condition and that it breached that duty in two ways:  by failing to perform adequate maintenance on the electrical wiring and by failing to inspect the fire suppression system and ensure that it was functioning as of the day of the fire.  (See Doc. 34 at 22).  UIS claims that the first breach resulted in "an electrical fire . . . ignited by the faulty wiring, resulting in damage to all of UIS'[s] excess inventory that was stored within the . . . building," and that the second breach

---

cigarette smokers but did not admit they had been smoking on the couch.  Olswanger does not mention the doctrine of waste, and the court relied on negligence and *res ipsa loquitur*. The court noted, however, "that application of the doctrine of res ipsa loquitur, or lack of application, must of necessity depend upon the facts and circumstances of the particular case."  Id. at 15.  The instant case is clearly distinguishable from Olswanger, and at this juncture the Court can certainly not conclude that *res ipsa loquitur* applies here.

Moreover, the parties have not mentioned or addressed the impact, if any, of section 66-7-102(b) of the Tennessee Code.  This section provides that "[a] covenant or promise by the lessee to leave or restore the premises in good repair shall not have the effect to bind the lessee to erect or pay for such buildings as may be . . . destroyed, unless in respect of the matter of loss or destruction there was neglect or fault on the lessee's part, or unless the lessee has expressly stipulated in writing to be so bound."

directly and proximately resulted in the fire that "completely destroyed all of UIS'[s] excess inventory."  (Id.).  UIS alleges that it has been damaged in the amount of the value of its destroyed property; in the amount of the value of property of other persons that was within the building at the time of the fire for which UIS was responsible or could be held responsible; and in the amount of money UIS spent for cleanup of the damage from the fire.

Dart contends that it did not breach a duty as landlord to maintain the premises in a safe condition, focusing only on the fire suppression issue.  As noted by UIS in its response memorandum (see Doc. 92 at 15), Dart does not, in its motion, address UIS's allegation that Dart failed to maintain its electrical wiring in a reasonably safe condition.  In its Reply (Doc. 97), Dart contends that "there is much rhetoric in Defendants' Opposition claiming that Dart committed some negligence in connection with the electrical system but Defendants never even allege what that negligent act or omission was."  (Id. at 2).  Dart then contends that "[t]here is not a scintilla of evidence that Dart committed any negligent act in connection with the electrical system in the Plant."  (Id.).  However, Dart failed to address this basis of negligence—plainly pled by UIS in its Counterclaim (see Doc. 34 at 22)—and Dart may not belatedly do so in its Reply; Dart obtained permission to file a Reply, but it did not request, and was not granted, permission to address this issue in it for the first time.  (See Docs. 93 & 94).  To allow Dart to do so would deprive UIS of the opportunity to present evidence in support of the claim.  Thus, summary judgment cannot be granted on the negligence claim for this reason alone.  The Court will, however, also address the fire suppression system theory.

The Plant was equipped with a fire suppression system that also served the UIS

Building.  (See, e.g., Acor Dep. at 97-98).  Kenneth Bridges, who worked for Tupperware at the Campus from 1968 to 1998, testified in his deposition that prior to the sale of the property to Drake in 1999, he had, as maintenance manager for Tupperware, regularly maintained and inspected the fire suppression system.  (Bridges Dep. at 21-25).  There were two 250,000-gallon water tanks and fifty-five hoses supporting the automatic sprinkler system.  (Id. at 27-28).  In a pump house between the water tanks were two pumps—a primary electric pump and a backup diesel pump.  (Id. at 31-32).  Up until November 1998, Mr. Bridges inspected the pumps weekly and the hoses monthly, and through at least that time the fire suppression system was operational.  (Id. at 26-31, 35, 61).

However, when Dart took over the property from Drake, it was obvious that Drake had allowed the system to fall into disrepair; many of the pipes had ruptured and the pumps did not work.  (Id. at 225-26).  Dart called Mr. Bridges back to do some work on the system; Mr. Bridges made some minor repairs to the piping and, at the direction of Mr. Benkovich, got the water tanks refilled.  (Id. at 65-68).  Mr. Bridges discussed the matter of repairing the pumps with Mr. Benkovich, and Mr. Benkovich did not want the pumps repaired at that time.  (Id. at 79, 90).  According to Mr. Bridges, without the pumps being repaired, the system was not really improved.  (Id. at 82).  It is undisputed that Tupperware did not take the steps needed to make the fire suppression system functional in 2002.  (Benkovich Dep. at 24).  As noted by Dart's counsel at oral argument, Tupperware decided to mothball the system because the steel and concrete building was vacant.

Mr. Acor acknowledged in his deposition that he did not know if UIS had done anything to mitigate the risk of fire at the Plant, and during the fourth quarter of 2006 he did

not make any effort to ensure that the fire suppression system was operational at the Plant or at the UIS Building.  (Acor Dep. at 97-99).  He does not recall any efforts by anyone at UIS to restore the fire suppression system into service at any time prior to the fire.  (Id. at 110).  He testified in his deposition that he did not know that the fire suppression system at the Plant was not in service; he believed it was in service.  (Id. at 111).

"The common law of landlord liability in Tennessee has long been established." Maxwell v. Davco Corp. of Tenn., 776 S.W.2d 528, 531 (Tenn. Ct. App. 1989).  "[A] landlord is liable to a tenant on the ground of negligence, not of contract, for an injury resulting from an unsafe or dangerous condition of leased premises that was in existence at the date of the lease, if the landlord by the exercise of reasonable care should have known, and for a greater reason, if he had actual knowledge of the condition of the premises; provided, however, that as of the date of the accident the tenant did not have knowledge or could not by the exercise of reasonable care have had knowledge of such condition."  Id. at 531-32. Moreover, "the landlord is not liable in tort for dangerous conditions on premises leased to the tenant arising after the delivery of possession to the tenant."  Id. at 532.  "[C]o-extensive knowledge of the existence of any defective condition by both Lessor and Lessee [negates] any liability on the part of the Lessor."  Id.

"'The degree of care and diligence required of [landlords and tenants] is the same; that is, reasonable care and diligence, such as a reasonably prudent person would exercise if surrounded by the same or similar circumstances.'"  Glassman v. Martin, 269 S.W.2d 908, 909 (Tenn. 1954) (quoting Wilcox v. Hines, 46 S.W. 297, 302 (Tenn. 1898)).  A landlord is liable for hidden defects known to him and not disclosed to the tenant.  Id.  "A landlord is not

-14-

an insurer of the safety of the leased premises." <u>Jolly Motor Livery Corp. v. Allenberg</u>, 221 S.W.2d 513, 515 (Tenn. 1949). Instead, "[a] landlord is liable only for injury arising from a failure to act with the degree of forethought and intelligence that characterizes the conduct of prudent men in general." <u>Id.</u> "The rule does not place upon the landlord the obligation of an insurer or warrantor by contract, nor does it impose the extreme duty of constant care and inspection, but only reasonable care and diligence; and like reasonable care and diligence are required of the tenant, thus imposing reasonable care and good faith upon both in the absence of any contract or warranty." <u>Id.</u>

Dart contends that it did not breach a duty regarding the fire suppression system because the parties had co-extensive knowledge regarding the status of the fire suppression system or, at a minimum, UIS should have known of the nonfunctioning status of the fire suppression system. Mr. Acor has denied having knowledge that the fire suppression system was not functional; Dart argues that this assertion is "unbelievable," but the Court must accept it as true on summary judgment. As to whether UIS could have obtained knowledge of the status with reasonable diligence, a much closer question is presented, but on balance this point cannot be resolved against UIS at this stage of the case either. To be sure, UIS may have a difficult time convincing a jury that it should not reasonably have discovered the status of the fire suppression system, particularly considering that the system was shared with the UIS Building; that gauges for the system were in the UIS Building; and that UIS made a contract with a third party assuring that fire systems were in place.[9]

_____

[9]Although the Court does not find that this contract created a legal duty of Defendants to assess the system, it is certainly evidence that Defendants should have at least checked

However, there is also evidence of, in addition to the electric and diesel pumps, a "jockey pump" that was designed to make sure normal pressure was maintained in the sprinkler lines. (See Bridges Dep. at 206 & 216-17; Childress Dep. at 118-19). The Court has been directed to no evidence indicating what the gauges in UIS's building indicate or do not indicate. Moreover, there is evidence that Mr. Childress, known to Defendants to be Dart's agent on the property, had the water tanks for the system refilled within the year prior to the fire. Summary judgment cannot be granted with regard to the issue of the fire suppression system. Dart's motion is denied on the negligence counterclaim.

B.  Defendants' Motion for Final Summary Judgment (Doc. 86)

Defendants have moved for summary judgment on all nine of Dart's claims.

1.  *Count I—Breach of Contract*

In this Count, Dart alleges that the parties entered into an oral contract under which Dart gave Defendants permission to use and occupy the Plant on an occasional but not continuous basis and that the permitted use was limited to use of the storage space at one end of the building. (Doc. 1 at 5-6). Dart alleges that Defendants materially breached that agreement. (Id. at 6). The parties appear to agree that Tennessee law governs this claim; Defendants cite Tennessee law in their motion and Dart responds without contesting the applicability of Tennessee law, citing mostly Tennessee cases and one Florida case (see Doc. 90 at 12; cf. id. at 13 (specifically arguing that Florida law applies to Dart's *tort* claims)). The Court will apply Tennessee law to this claim.

---

it in order to be in compliance with the contract that it made.

Defendants contend that they are entitled to summary judgment on this claim for several reasons.  They argue that enforcement of this contract is barred by the statute of frauds, and they argue that there was no meeting of the minds as to any limitations on use and therefore the contract is limited to the part on which there is agreement—that UIS could use the Plant in exchange for payment of the increase in utility costs for the building. Defendants further aver that even if there is an enforceable agreement Dart cannot prove damages.

Taking the statute-of-frauds argument first, Tennessee law provides that "[n]o action shall be brought . . . [u]pon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year." Tenn. Code Ann. § 29-2-101(a)(4).   However, "there must be evidence to demonstrate that the parties specifically agreed that the contract absolutely would not be performed within one year for it to run afoul of the statute of frauds." Birdwell v. Psimer, 151 S.W.2d 916, 919 (Tenn. Ct. App. 2004).  "Unless the court, looking at the contract in view of the surroundings, can say that in no reasonable probability can such agreement be performed within the year, it is its duty to uphold the contract." Id. The one-year statute-of-frauds "provision is to be construed very narrowly by the courts, since the court should generally try to give effect to a contract rather than defeat it." Id.  It cannot be said that the agreement at issue here could not with reasonable probability have been performed within one year.  Thus, Defendants are not entitled to summary judgment on this basis.

Defendants also contend that because there is no evidence of assent to any terms beyond consent to UIS's use of the Plant in exchange for utility costs, there can be no

breach.  However, this argument is not well-taken.  The parties dispute the terms of this oral agreement, but this dispute does not mean that whatever agreement they reached could not be breached by Defendants or that Defendants' less limited description of the agreement's terms controls.   In other words, the fact that Defendants deny assent to the terms as described by Dart does not mean that the terms are those as claimed by Defendants.

Dart claims that Defendants have exceeded the scope of the permission granted in two ways:  first, by storing more material in the Plant than they were permitted to store, for a longer period than they were permitted to store it, and second, by using heavy equipment in the Plant.  As to the first alleged breach, Dart cannot prevail because Dart was on notice of how much material Defendants were storing in the building and waived any objection to Defendants' storage practices.  In 2002, Dart had hired Billy Joe Childress to take care of the Campus so that it would be well-maintained while Dart made efforts to sell it, and Mr. Childress had access to the Plant and also had a dedicated space for his maintenance shop in a corner of the Plant.  Mr. Childress testified in his deposition that Ms. Morrissey, a lawyer and Vice-President of Dart in Orlando, called him in early 2004 and told him that Mr. Acor had asked for permission to put five loads of merchandise in the southwest corner of the Plant and that he was allowed to do so.  (Childress Dep. at 51-52).  Some time later, Mr. Childress went into the Plant to inspect it and found it half full of merchandise.  (Id. at 52). Mr. Childress called Ms. Morrissey and asked if she was aware of this; Ms. Morrissey responded that she was not aware of it but that Mr. Childress should not be too concerned because UIS had agreed to be responsible for any damage to the building and for the electric bill.  (Id. at 53).

After Mr. Childress had this conversation with Ms. Morrissey, Mr. Childress had a photographer make a folder of photographs of UIS's material in the building, and Mr. Childress sent it to Ms. Morrissey.  (Id. at 54).   Mr. Childress described the photos as depicting plastic and paper baled and stacked to the ceiling.  (Id. at 55).  Childress did not thereafter discuss UIS's storage in the Plant with Ms. Morrissey or anyone else at Dart; as he explained in his deposition, "Tupperware was aware of what was in the building" and he "was told not to be concerned about it."  (Id. at 57-59).  Additionally, Ms. Morrissey testified in her deposition that she spoke with Mr. Acor in September or October 2006—within two months of the November 4 fire—about a law enforcement incident at the property and did not specifically ask him at that time the extent to which UIS was using the Plant.  (Morrissey Dep. at 109).  When then asked whether she was concerned about the extent of UIS's use, she replied, "Once I was satisfied that he wasn't doing anything unlawful there, as far as I was concerned he was operating under the authority that Mr. Benkovich granted him."  (Id.).

In light of the presence of Mr. Childress and the testimony of Dart's own personnel regarding its awareness and lack of concern about the extent of UIS's storage at the Plant, Dart cannot prevail on a breach of contract claim related to the extent of the storage. However, there is no evidence that Dart was aware prior to the fire of UIS's use of machinery (other than forklifts) in the Plant; to the extent Dart seeks to recover on that basis, summary judgment cannot be granted to Defendants.

Finally, Defendants assert that Dart cannot prove damages under the oral agreement, arguing that the only available remedy is "rent" as defined in the agreement.  Dart responds that "under Tennessee law . . . when a fire occurs in premises under the possession and

control of the defendant, even if the plaintiff cannot even allege the cause of the fire, under the doctrine of *res ipsa loquitur*, the defendant is liable for the damages caused by the fire to the building." (Doc. 90 at 13). However, *res ipsa loquitur* is a *tort* doctrine, not a contract doctrine. See, e.g., Black's Law Dictionary 1336 (8th ed. 2004) (defining the phrase as "[t]he doctrine providing that, in some circumstances, the mere fact of an accident's occurrence raises in inference of *negligence* so as to establish a prima facie case" (emphasis added)). Res ipsa loquitur does not entitle Dart to extracontractual damages on their breach-of-contract claim. However, it is not clear that Dart will be unable to recover any damages at all on this claim. Defendants' motion for summary judgment on this claim is denied.

   *2. Counts II and III—Fraudulent Misrepresentation and Negligent Misrepresentation*

   In Counts II and III, Dart alleges claims of fraudulent misrepresentation and negligent misrepresentation, respectively. Dart contends that Defendants made false representations that induced Dart to allow them to use the Plant; that Dart relied on the representations; and that Dart has been damaged by those representations. In their papers, the parties dispute whether Tennessee or Florida law governs these claims,[10] but at the pretrial conference on October 30, 2008 the parties acknowledged that there is little if any difference in the law of the two states.[11]

_____

[10]As discussed infra in connection with the FDUTPA claim, the Court concludes that Tennessee law governs the tort claims in the case.

[11]Tennessee courts have set forth the elements of fraudulent misrepresentation as: "(1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation[']s falsity—that the representation was made 'knowingly' or 'without belief in its truth,' or 'recklessly' without regard to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation

Reliance is an element of these two claims under the law of both Tennessee and Florida.  As discussed above with regard to the breach-of-contract claim, Dart cannot establish reliance—or, alternatively, has waived reliance—with regard to the amount of materials that UIS stored in the Plant, and Dart has no actionable claim for fraudulent or negligent misrepresentation based on storage.  Even assuming that Mr. Acor represented that the amount was "limited" or "temporary," Dart did not rely on that statement or, at a minimum, by the time of the fire Dart did not care any more about the amount of materials to be stored there.  Dart told its onsite agent, Mr. Childress, not to be concerned about the storage, and Ms. Morrissey was not concerned just before the fire so long as UIS was not doing anything illegal.  Thus, as with the breach-of-contract claim, the misrepresentation

_____

relates to an existing or past fact." Orndorff v. Calahan, No. M2007-02060-COA-R3-CV, 2008 WL 4613546, at *5 (Tenn. Ct. App. Oct. 9, 2008) (citing Murvin v. Cofer, 968 S.W.2d 304, 310 (Tenn. Ct. App. 1997)).  Florida courts list the following elements of this tort:  "(1) a misrepresentation of a material fact; (2) which the person making the misrepresentation knew to be false; (3) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (4) that the person relied on the misrepresentation to his detriment; and (5) that this reliance caused damages." Romo v. Amedex Ins. Co., 930 So. 2d 643, 651 (Fla. 3d DCA 2006).

Under Tennessee law, "[i]n order to prevail in a suit for negligent misrepresentation, the plaintiffs must establish by a preponderance of the evidence that the defendant supplied information to the plaintiff; the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information and the plaintiffs justifiably relied on the information." Williams v. Berube & Assocs., 26 S.W.3d 640, 644-45 (Tenn. Ct. App. 2000).  The elements of negligent misrepresentation in Florida are:  "'that (1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.'" Fla. Women's Med. Clinic v. Sultan, 656 So. 2d 931, 933 (Fla. 4th DCA 1995) (quoting Baggett v. Electricians Local 915, 620 So. 2d 784, 786 (Fla. 2d DCA 1993)).

claims are not viable with regard to storage, but insofar as they pertain to use of equipment at the Plant, Counts II and III survive summary judgment.

   3.  *Count IV—Breach of Implied Covenant of Good Faith and Fair Dealing*

   Dart alleges in Count IV that the parties' oral agreement contained, as a matter of law, an implied covenant of good faith and fair dealing which was breached by Defendants. In their summary judgment motion, Defendants point out that in <u>Shah v. Racetrac Petroleum Co.</u>, 338 F.3d 557 (6th Cir. 2003), the court held that although there is a Tennessee statute providing that there is an implied duty of good faith and fair dealing in all contracts, "[b]reach of the implied covenant of good faith and fair dealing is not an independent basis for relief." <u>Id.</u> at 572 (discussing Tenn. Code. Ann. § 47-1-203 and its official commentary).  Dart has not responded to this argument, and although in its opposition memorandum Dart included "breach of the implied covenant of good faith" in its subheading regarding the breach of contract claim, Dart does not separately address or even mention Count IV.  Defendants' motion for summary judgment on this claim will be granted.

   4.  *Count V—Unjust Enrichment*

   Dart brings an unjust enrichment claim in Count V, asserting that it conferred a benefit on Defendants when Defendants made substantially greater use of the Plant than the use the Defendants represented; that Defendants knew of the benefit and voluntarily retained and accepted the benefit; that Defendants paid only a fraction of the rent that Dart would have demanded if Defendants had not misrepresented the scope of their use of the Plant; that it would be inequitable for Defendants to retain the benefit without paying the value of

the benefit to Dart; and that Defendants have thus been unjustly enriched.  (Doc. 1 at 8-9).[12]

Defendants seek summary judgment on this claim on the basis that the only "rent" Dart ever

sought from UIS was the amount of utility overages at the Plant.   Dart responds that

Defendants "are liable for the fair market rental value of their occupancy . . . because they

vastly increased their occupancy beyond that permissible under the Oral Agreement." (Doc.

90 at 17).

As with the contract and misrepresentation claims, Dart cannot pursue an unjust

enrichment claim based on the amount of materials but may perhaps be able to recover

based on UIS's use of equipment in the Plant.   The motion for summary judgment is thus

denied with regard to this count.

   *5.  Count VI—Waste*

An noted in the discussion of Dart's motion, in Count VI Dart seeks to recover

damages on a theory of waste.   Defendants also seek summary judgment on this claim,

asserting that Dart "seeks a complete misapplication of this theory of liability under the facts

of this case" because "[t]he alteration to the building was not an intentional restructuring or

improvement" and "[t]he fire damage here simply is not the damage contemplated under a

theory of waste."  (Doc. 86 at 26).  Defendants respond that this argument is frivolous (see

Doc. 90 at 18), and neither side cites case law that is particularly helpful to the Court

regarding the application of the theory of waste to the facts of this case.

The Court cannot conclude as a matter of law or fact at this stage of the case that

---

[12]Defendants cite Tennessee law on this claim, and Dart does not challenge that Tennessee law applies.  (See Doc. 90 at 17-18).

there is no actionable waste claim here.  As earlier noted, however, Tennessee courts have held that "'[o]nly that which does lasting damage to the remainder, or depreciates its value, is waste.'"  Barber v. Westmoreland, 601 S.W.2d 712, 716 (Tenn. Ct. App. 1980) (quoting Thompson v. Thompson, 332 S.W.2d 221, 227 (1959)).  Clearly, the damage to the property was from the fire, not merely from storage of materials by Defendants.  At the pretrial conference, the Court was advised that Dart is no longer seeking damages for diminution in the value of the property this claim, and Dart has been asked to submit further briefing on what damages it may properly recover for waste.  Defendants' motion for summary judgment is denied as to Count VI.

      *6.  Count VII—Trespass*

      In this Count, Dart alleges that it granted Defendants access to the Plant only for the purpose of "occasionally," rather than "continuously," storing UIS's plastics and that Defendant's use beyond that limited grant of access amounts to a trespass under Tennessee law.[13]  Defendants argue in their summary judgment motion that trespass requires unauthorized, unlawful entry and that this did not occur here.  They assert that Ms. Morrissey testified that there was only one part of the Plant that UIS was not permitted in–the upstairs portion, which UIS did not use.  Dart responds by maintaining that Defendants' act of exceeding the scope of the permission they received—both in time and area—constitutes a trespass.

      Each side cites only one case regarding this claim, but neither is helpful.  Defendants

---

[13]The parties agree that Tennessee law governs this claim.  (See Doc. 108 at 59).

rely on <u>Rector v. Halliburton</u>, No. M1999-02802-COA-R3-CV, 2003 WL 535924 (Tenn. Ct. App. Feb. 26, 2003), for the  statement that "[t]respass upon real property entails the unauthorized, and therefore unlawful entry into the close of another." <u>Id.</u> at *6.  Dart cites <u>Etheridge v. First National Bank of Jackson</u>, 387 S.W.2d 835 (Tenn. Ct. App. 1964), an unlawful detainer action by a landlord against a tenant who remained on the premises beyond the date by which he had agreed to vacate.  The <u>Etheridge</u> court, noting that "'[i]n the absence of mutuality of intent, a tenant who . . . has agreed to surrender possession at the end of the term becomes a trespasser subject to eviction at the landlord's election,'" found that the tenant had become a trespasser.  <u>Id.</u> at 837.

Here, UIS clearly had permission to enter the Plant to some extent and for some time.  As Ms. Morrissey acknowledged in her deposition, Dart never told UIS prior to the fire to stop using the Plant.  (Morrissey Dep. at 63).  Thus, the holdover tenant case cited by Dart is inapposite.  Ms. Morrissey also testified in her deposition that she "probably would not have had an issue with" UIS storing material at the north end of the Plant if she had known about it, even though approval had been given to use the south end near the loading dock.  (<u>Id.</u> at 55).  Clearly, Dart was not concerned with the portions of the Plant that UIS was using; at best, initially it had a concern with the volume of material in it.  Moreover, as noted earlier in discussion of other claims, Dart has waived any objection it had to the amount of material UIS was storing in the Plant.  UIS did not unlawfully enter the Plant, and Dart was on notice as to how much of the building UIS was using and did not object.  Trespass is an unavailing theory of recovery on the facts of this case, and Defendants' motion for summary judgment is granted as to this count.

### 7. Count VIII—FDUTPA

In Count VIII, Dart alleges that Defendants' actions constituted "unconscionable, unfair, and deceptive acts and practices" under section 501.204(1), Florida Statutes, part of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Defendants contend that this claim fails for several reasons.  They argue that "citizens of Tennessee do not subject themselves to this Act" by talking on the phone to a person in Florida to discuss the use of property in Tennessee; that the Act does apply to causes of action regarding commercial property; that the claim is a tort claim and Tennessee law governs tort claims in this case; that there is no deceptive practice here; and that Dart cannot prove causation or damages. The Court agrees with Defendants' argument that Tennessee law governs the tort claims in this case and therefore, the FDUTPA claim is not viable.

Florida's choice-of-law rules govern in this case.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (holding that federal courts are to apply the conflicts of laws rules of the state in which they sit).  With regard to tort claims, Florida courts apply "the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws § 145." Trumpet Vine Invs., N.V. v. Union Capital Partners, I, Inc., 92 F.3d 1110,1115-16 (11th Cir. 1996).  As the Trumpet Vine court explained, Section 145 of the Restatement provides that "'[t]he rights and  liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.'" Id. at 1116 (quoting Restatement (Second) of Conflict of Laws § 145(1)).

"'Contacts to be taken into account in applying the principles of § 6 to determine the

Case 6:06-cv-01864-JA-DAB   Document 144   Filed 11/05/08   Page 27 of 30 PageID 3324

law applicable to an issue include:  (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'"  Id. (quoting Restatement (Second) of Conflict of Laws § 145(2)).[14]  Applying these factors here:  (a) the alleged injury occurred in Florida, where Dart has its principal place of business; (b) the conduct occurred in Tennessee; (c) Dart is a Delaware corporation with its principal place of business in Florida, Mr. Acor is a Tennessee resident, and UIS is a Tennessee corporation with its principal

_____

[14]In its choice-of-law argument, Dart discusses the FDUTPA claims together with the misrepresentation claims and notes that in Trumpet Vine the Eleventh Circuit applied the factors in Restatement (Second) of Conflict of Laws § 148 to fraud and misrepresentation claims.  92 F.3d  at 1118.  Those factors differ somewhat from those discussed in the text.  However, those factors do not seem to apply to the FDUTPA claim because Florida courts have held that reliance is not an element of an FDUTPA claim, see, e.g., Davis v. Powertel, Inc., 776 So. 2d 971, 973 (Fla. 1st DCA 2000); the factors listed in section 148 of the Restatement only come into play "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made." Restatement (Second) of Conflict of Laws § 148(2).

In any event, even applying the section 148 factors the Court still concludes that Tennessee has the most significant relationship to the tort claims in this case.  These factors are:  (1) "the place . . . where the plaintiff acted in reliance upon the defendant's representations"; (2) "the place where the plaintiff received the representations"; (3) "the place where the defendant made the representations"; (4) "the domicil, residence, nationality, place of incorporation and place of business of the parties"; (5) "the place where a tangible thing which is the subject of the transaction between the parties was situated at the time"; and (6) "the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." Trumpet Vine, 92 F.3d at 1118 (quoting Restatement (Second) of Conflict of Laws § 148(2)).  Moreover, in Trumpet Vine, the Eleventh Circuit noted with approval the commentary to another Restatement section that "'the place of injury is less significant in the case of fraudulent misrepresentations."  Id. at 1116 (quoting Restatement (Second) of Conflict of Laws § 145 comment f).  Only the first two of these factors favor Florida, and the others are either neutral or favor Tennessee.  The state of Tennessee has the "most significant relationship" to the tort claims here.

-27-

place of business in Tennessee; and (d) the relationship of the parties is clearly centered in Tennessee, where the property upon which their relationship is based is located.  On balance, Tennessee "has the most significant relationship" here, and accordingly Tennessee law governs the tort issues in this case.  Summary judgment will be granted to Defendants on the FDUTPA claim in Count VIII.[15]

### 8.  Count IX—Declaratory and Injunctive Relief

Dart seeks a judgment declaring that Defendants are obligated to defend, indemnify, and hold harmless Dart for all third-party claims arising from the fire.  Defendants contend that they are entitled to summary judgment on this count because a declaratory judgment can be issued only where there is an "actual controversy" and Dart has not alleged an actual injury from which it needs protection.  Dart responds that it has already been named as a defendant in a third-party action brought by a company whose property was allegedly consigned to Defendants and destroyed in the fire and that UIS has brought a claim seeking to compel Dart to indemnify Defendants for that third party's claim.

The motion for summary judgment on this claim is denied, and this issue will be addressed, if necessary, after the jury trial in this matter.

### 9.  Claims Against Defendant Acor Individually

Dart has brought all nine of its claims against both UIS and Mr. Acor.  Mr. Acor contends that he is not a proper defendant because Dart has not alleged any facts indicating that he was acting outside of his role as President of UIS during the events at issue.  Mr.

---

[15]In light of the conclusion that Tennessee law applies to the tort claims, the Court need not address whether Dart's FDUTPA claim is otherwise viable on the facts of this case.

Acor cites a Tennessee statute providing that "[a]n officer [of a corporation] is not liable for any action taken as an officer, or any failure to take any action, if the officer performed the duties of office in compliance with this section."  Tenn. Code Ann. § 48-18-403(d).  Dart argues that Florida law applies and that even under Tennessee law, the claims against Mr. Acor individually are proper.  Dart seems to only address its tort claims, and thus the Court assumes that Dart is only pursuing Counts II, III, and VIII against Mr. Dart at this point.

The statute cited by Mr. Acor does not afford absolute immunity[16] for tort liability, and the Court cannot discern, for summary judgment purposes at least, any difference between Florida and Tennessee law with regard to the scope of a corporate officer's liability for torts. Compare Jurgensmeyer v. Prater, No. M2000-02986-COA-R3-CV, 2003 WL 1923826, at *6 (Tenn. Ct. App. Apr. 24, 2003) ("[A]n individual may be liable for fraud or misrepresentation even when acting as an agent for a corporation. . . . 'An officer or director of a corporation who commits or participates in the commission of a tort is likewise liable to third parties regardless of the liability of a corporation.'") (citations omitted) (emphasis removed), with Orlovsky v. Solid Surf, Inc., 405 So. 2d 1363, 1364 (Fla. 4th DCA 1981) ("'If . . . a director or officer commits or participates in the commission of a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby, and it does not matter what liability attaches to the corporation for the tort.'") (quoting 19 Am. Jur. 2d Corporations § 1382).  Although Mr. Acor correctly notes that in her deposition, Ms. Morrissey

---

[16]See Dolan v. Poston, No. M2003-02573-COA-R3-CV, 2005 WL 2402919, at *6 (Tenn. Ct. App. Sept. 29, 2005) ("[T]he immunity granted by the statute is conditional, not absolute.").

acknowledged that Mr. Acor was acting on behalf of UIS,[17] Mr. Acor can still potentially be liable for torts even if the contractual dealings were between Dart and UIS.  Thus, while the claims in Counts I, IV, V, VI, VII, or IX are not, and are not now alleged by Dart to be, viable against Mr. Acor, he is not entitled to summary judgment on the tort claims in Counts II or III.[18]

## IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Plaintiff's Motion for Partial Summary Judgment (Doc. 84) is **DENIED**.

2.  Defendants' Motion for Final Summary Judgment (Doc. 86) is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** with respect to Counts IV, VII, and VIII as to both Defendants.  Additionally, the motion is **GRANTED as to Defendant Acor only** with respect to Counts I, V, VI, and IX.  The motion is otherwise **DENIED** as set forth herein.

**DONE** and **ORDERED** in Orlando, Florida this 5th day of November, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

---

[17](See Morrissey Dep. at 151-52 (stating that she understood that in her contacts with Mr. Acor regarding the use of the building, he was acting on behalf of UIS and that her "arrangement was with UIS and [her] contact at UIS was Mr. Acor")).

[18]The Court has granted summary judgment to both Defendants on Count VIII.